PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CASE NO. 1:13cr170 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| CHARMIN REEVES, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendant. | ) | **ORDER** [Resolving ECF No. 90] |

Pending before the Court is Defendant Charmin Reeves' Motion for a Judgment of
Acquittal and for New Trial (ECF No. 90).  The Court has been advised, having reviewed the
record, the parties' briefs and the applicable law.  For the reasons explained below, Defendant's
motion is denied.

## I.  Background

A jury convicted Defendant of one count of conspiracy to possess with intent to distribute
and to distribute of Oxycodone in violation of 21 U.S.C. § 846 (Count 1 of the Superseding
Indictment); four counts of aiding and abetting health care fraud in violation of 18 U.S.C. §§
1347(a)(1) or 2 (Counts 2 through 5 of the Superseding Indictment); and four counts of aiding
and abetting aggravated identity theft in violation of 18 U.S.C. §§ 1028A(a)(1) or 2 (Counts 6
through 9 of the Superseding Indictment).  *See* Jury Verdict Forms (ECF No. 80).

### A.  Trial Evidence

During trial, the Government presented evidence of five fraudulent prescriptions for

(1:13cr170)

OxyContin.  Four of the five fraudulent prescriptions were for Charmin Wray[1] and allegedly had been written by Dr. Deborah Cook.  ECF No. 85 at 246–53.  The fifth fraudulent prescription was for Kamille Carter and allegedly had been written by Dr. John Bergfeld.  *Id.* at 30.  During its case in chief, the Government presented the testimony of JaNale Roberts (ECF No. 84 at 33–44), Kay Jones-Williams (*Id.* at 45–72), Dr. John Bergfeld (ECF No. 85 at 4–52), Kamille Carter (*Id.* at 53–103), Sergeant Thomas Arriza (*Id.* at 105–23), Tracy Dickinson (*Id.* at 126–36), Christina Cannata (*Id.* at 143–77), Dr. Deborah Cook (*Id.* at 178–94), Bradley Janko (*Id.* at 201–14), David Borovicka (*Id.* at 215–23), and Jeffrey Schmitt (*Id.* at 225–65).

Dr. Bergfeld testified that Defendant worked in an office adjacent to his at the Cleveland Clinic.  *Id.* at 13.  Dr. Bergfeld also testified that he typically kept his prescription pad stored in either his coat or his desk, both of which were stored in his office.  *Id.* at 19.  Dr. Bergfeld further testified concerning the fraudulent prescription that Kamille Carter attempted to have filled on November 29, 2009 (the "Carter/Bergfeld prescription").  Dr. Bergfeld testified that he did not treat Carter for any medical condition.  *Id.* at 30.  Dr. Bergfield also testified that the Carter/Bergfeld prescription concerned him because it prescribed a high quantity (90 pills) of high-dosage (80 mg) OxyContin pills.  *Id.* at 32.  Dr. Bergfeld also testified that the Carter/Bergfeld prescription contained incorrect medical terminology that he would not have used when writing a prescription: the prescription stated that the pill should be taken both as needed and three times a day.  *Id.* at 33.

---

[1] Defendant changed her name to Charmin Wray after she married.  Defendant resumed the use of her maiden name, Charmin Reeves, at some point thereafter.  ECF No. 85 at 71.

(1:13cr170)

Dr. Cook testified that one of her prescription pads had been stolen from her office in 2009. ECF No. 85 at 180. Shortly after the theft, Dr. Cook began to receive notifications from pharmacists that people using prescriptions allegedly written by her were attempting to obtain OxyContin. Id. at 181. Dr. Cook testified that she had never prescribed OxyContin for any patient. Id. at 179–80. Dr. Cook also testified concerning the four fraudulent prescriptions that were allegedly written under the name Charmin Wray (the "Wray/Cook prescriptions"). Dr. Cook testified that she had not treated Defendant as a patient, and that she did not write the four Wray/Cook prescriptions. Id. at 187. Dr. Cook also testified that the Wray/Cook prescriptions contained erroneous medical terminology: that the pill should be taken both as needed and three times a day. Id. at 183. These are the same errors present in the Carter/Bergfeld prescription.

Jeffrey Schmitt testified that he was responsible for managing the prescription drug benefits for the Cleveland Clinic Employee Health Plan. Id. at 225. In that capacity, Schmitt had access to the records of Clinic employees' pharmacy benefits. Schmitt testified that he reviewed Defendant's records from 2003 to 2010. Id. at 235. During the period reviewed, Defendant had filled prescriptions for medicine containing oxycodone (the active ingredient in OxyContin) five times. Once, in 2007, Defendant had a prescription filled for a liquid, generic form of oxycodone that had a strength of 5 mg. Id. at 244–45. Schmitt testified that Defendant had successfully filled four different prescriptions for OxyContin at CVS pharmacies—on October 9, 2009, November 8, 2009, December 2, 2009, and January 19, 2010. Id. at 246–52. All four prescriptions were for OxyContin, 80 mg strength, and were purportedly signed by Dr. Cook. Id. at 253. Additionally, Defendant's records indicated that an OxyContin prescription

3

(1:13cr170)

failed to adjudicate on November 29, 2009, meaning that the insurance would not pay for the prescription.  ECF No. 85 at 250.  Schmitt testified that Defendant would have received an Explanation of Benefits form as a result of the prescription that failed to adjudicate.  *Id.* at 251.

Bradley Janko testified to the procedure followed by the CVS drugstore located in Euclid, Ohio when a new patient fills a prescription.  Janko testified that when the pharmacy representative takes the prescription, she asks for the patient's name, date of birth, address, and phone number.  *Id.* at 206.  The pharmacy representative also asks for the patient's insurance so that the pharmacy can bill the insurance company for the prescription.  *Id.* at 207.  Janko testified that a patient can provide her insurance information in two ways.  The patient can produce her insurance card, or tell the pharmacy representative the name of her insurance provider (whom the pharmacist then calls to confirm insurance coverage).  *Id.* at 209.  If the patient does not have her insurance card, Janko testified that the patient would need to provide the pharmacy representative with personal information, such as name, date of birth, and address, in order to confirm insurance coverage.  *Id.* at 209.

Kamille Carter is Defendant's cousin.  *Id.* at 53.  Carter testified that Defendant contacted her in November 2009 and asked if Carter would fill a prescription in exchange for money.  *Id.* at 58.  Carter testified that Defendant babysat Carter's children while Carter went to fill a prescription for OxyContin.  *Id.* at 59.  Carter was arrested after she attempted to fill the prescription at a Walgreens drugstore in Euclid, Ohio.  *Id.* at 61.  After Carter was released by the police, she and her mother went to Defendant's house.  Carter testified that, while at Defendant's home, Defendant said an arrest "hadn't happened to the person who did it before."

4

(1:13cr170)

[ECF No. 85 at 62](#).  Carter also testified that Defendant then placed two phone calls.  After speaking on the phone with two separate people, Defendant told Carter that she should be okay because this was Carter's first arrest.  *Id.* at 63.

## B.  Pending Motion

Defendant has filed a motion for judgment of acquittal and for a new trial ([ECF No. 90](#)).  The motion challenges the sufficiency of the evidence presented by the Government, argues that the jury verdict was against the manifest weight of the evidence, and argues that a legal error contained in the jury instructions warrants a new trial.  The Government filed a response in opposition ([ECF No. 93](#)).  Defendant replied to the Government's opposition ([ECF No. 94](#)).  The motion is ripe for adjudication.

## II.  Legal Standard

## A.  Motion for Judgment of Acquittal

[Fed. R. Crim. P. 29(a)](#) provides, in pertinent part, that the district court, on motion by the defendant, "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  The United States Supreme Court in *Jackson v. Virginia,* *443 U.S. 307 (1979),* established the standard for challenges based on the claimed insufficiency of the evidence, holding:  "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* at 319 (emphasis in original); *see United States v. Smith,* 749 F.3d 465, 476 (6th Cir. 2014); *United States v. Fisher,* 648 F.3d 442, 450 (6th Cir. 2011); *United States v. Warshak,* 631 F.3d 266, 308 (6th Cir. 2010) (en banc).  This is a

(1:13cr170)

"very heavy burden" for defendants who have been convicted to meet.  *United States v. Jones*, 641 F.3d 706, 710 (6th Cir. 2011).

Under this standard of review, the district court "'do[es] not weigh the evidence, assess the credibility of the witnesses, or substitute [its] judgment for that of the jury.'"  *United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006) (quoting *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994)).  Rather, the court must "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict."  *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001); *see United States v. Overmyer*, 867 F.2d 937, 939 (6th Cir. 1989) (("the court assumes the truth of the evidence offered by the prosecution") (quoting *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985)).  "Reversal of a conviction is warranted only if, viewing the record as a whole, the judgment is not supported by substantial and competent evidence."  *Smith*, 749 F.3d at 477 (internal quotations omitted).  "Substantial and competent circumstantial evidence by itself may support a verdict and need not remove every reasonable hypothesis except that of guilt."  *United States v. Lee*, 359 F.3d 412, 418 (6th Cir. 2004) (internal quotations omitted).

**B.  Motion for New Trial**

Fed. R. Crim. P. 33(a) provides, in relevant part: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  "The paradigmatic use of a Rule 33 motion is to seek a new trial on the ground that the [jury's] verdict was against the manifest weight of the evidence."  *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (internal quotations omitted; alteration in original).  Unlike when the district court is called upon to decide a motion for judgment of acquittal, the district court, when

6

(1:13cr170)

considering the weight of the evidence for purposes of adjudicating a motion for new trial, "may act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence." *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007).

"Motions for a new trial are not favored and are granted only with great caution." *United States v. Garner*, 529 F.2d 962, 969 (6th Cir. 1976).  Such motions "are granted only in the extraordinary circumstance where the evidence preponderates heavily against the verdict." *Hughes*, 505 F.3d at 593 (internal quotations omitted).  A convicted defendant "bears the burden of proving that a new trial should be granted."  *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994).

Finally, Rule 33's "interest of justice" standard also "allows the grant of a new trial where substantial legal error has occurred." *Munoz*, 605 F.3d at 373; *see United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004) (("any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial") (quoting 3 Charles Alan Wright, Federal Practice & Procedure § 556 (3d ed. 2004)); *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989) (new trial may be warranted when "the substantial rights of the defendant have been jeopardized by errors or omissions during trial").  The decision of whether a new trial should be granted rests within the district court's sound discretion.  *United States v. Wheaton*, 426 F. Supp.2d 666, 669 (N.D. Ohio 2006) (citing *United States v. Hoffa*, 382 F.2d 856, 862 (6th Cir. 1967)).

**III.  Discussion**

**A.  Count 1: Conspiracy to Possess with Intent to Distribute**

(1:13cr170)

In order to prove the existence of a conspiracy under 21 U.S.C. §§ 841(a)(1) and 846, the Government must establish, beyond a reasonable doubt, "'(1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy." *United States v. Pritchett*, 749 F.3d 417, 431 (6th Cir. 2014) (quoting *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir.1999), *cert. denied sub nom.*, *Johnson v. United States*, 135 S. Ct. 196 (2014). "An agreement to violate the drug laws need not be express or formal.  'A tacit or mutual understanding among the parties is sufficient.'" *United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006) (quoting *United States v. Forrest, 17 F.3d 916, 918 (6th Cir. 1994)*).  "Once a conspiracy is shown, evidence connecting a particular defendant to the conspiracy 'need only be slight.'  The defendant 'need not be an active participant in every phase of the conspiracy, so long as he is a party to the general conspiratorial agreement.'" *United States v. Wettstain*, 618 F.3d 577, 584 (6th Cir. 2010) (quoting *Gibbs*, 182 F.3d at 421–22).

Defendant argues that her conviction for conspiracy to possess with intent to distribute is not supported by sufficient evidence because the Government failed to present sufficient evidence of Defendant's knowledge or acquiescence in the conspiracy.  Defendant also argues that the Government did not present sufficient evidence to support an inference of intent to distribute OxyContin.

### 1.  The Government Presented Sufficient Evidence to Demonstrate Defendant's Knowledge

The Government presented testimony from Kamille Carter that proves the existence of a conspiracy between Defendant and Carter.  Carter testified that Defendant asked Carter to fill the OxyContin prescription in exchange for cash.  ECF No. 85 at 59.  As proof of Defendant's

8

(1:13cr170)

knowledge and an intent to join the conspiracy, Carter testified that Defendant solicited Carter to fill the prescription for money, not the other way around.  ECF No. 85 at 58.  Defendant gave Carter the prescription for OxyContin with instructions that Carter "go to the pharmacy and fill it."  Id. at 59.  Carter had not been legitimately prescribed OxyContin.  Id. at 67.  Having previously lived with Defendant, Carter testified that she was familiar with Defendant's handwriting.  Carter testified that the handwriting on the fraudulent prescription belonged to Defendant.  Id. at 68.

The Government also presented circumstantial evidence that Defendant stole the blank prescription on which the fraudulent prescription was written to further the conspiracy, as there was ample evidence that Defendant had access to Dr. Bergfeld's office where he stored his prescription pads.  Id. at 133.  Finally, Carter testified to numerous overt acts committed by Defendant in furtherance of the conspiracy.  For example, Carter testified that Defendant provided Carter with the fraudulent prescription that Carter took to the drugstore to be filled, and that Defendant went to Carter's house to watch Carter's children while Carter went to the drugstore.  Id. at 59.  These actions, the Government argues, allowed Carter to take the prescription to the pharmacy to be filled.

The Government also presented evidence of other conspiratorial efforts committed by Defendant with unknown individuals.  Carter testified that, after Carter told Defendant that she had been arrested for attempting to fill the Bergfeld prescription, Defendant called two other individuals.  Id. at 62–63.  According to Carter, Defendant made the phone calls in response to learning that Carter had failed to fill the prescription.  Id. at 64.  The Government also argues

9

(1:13cr170)

that the four Wray/Cook prescriptions circumstantially prove the existence of, Defendant's

knowledge of, and participation in a conspiracy with other individuals because all five

prescriptions–the one that failed to adjudicate and the four filled prescriptions--were written in

the same erroneously redundant fashion.

### 2.  The Government Presented Sufficient Evidence of Defendant's Intent to Distribute

The Government presented evidence that allowed the jury to infer that Defendant

intended to distribute OxyContin.  "A jury may infer that a defendant had the intent to distribute

drugs from circumstantial evidence of the possession of large quantities of drugs."  *United States*

*v. Young*, 243 F. App'x 105, 106 (6th Cir. 2007) (citing *United States v. Faymore*, 736 F.2d 328,

333 (6th Cir.1984)).  "Circumstantial evidence alone is sufficient to sustain a conviction and

such evidence need not remove every reasonable hypothesis except that of guilt."  *United States*

*v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999) (quoting *United States v. Vannerson*, 786 F.2d

221, 225 (6th Cir.1986)).

The Government presented evidence of the large quantity of OxyContin pills that

Defendant conspired to obtain.  Dr. Bergfeld testified that a typical prescription for OxyContin at

80 mg is 30 pills.  "I wouldn't write for 90 of a narcotic medication at all," Dr. Bergfeld testified

regarding the quantity.  ECF No. 85 at 32.  He described the quantity of 90 pills of 80 mg

OxyContin as "pretty severe.  That's a large number, unless there was some chronic problem,

and those, I don't usually see that kind of patient."[2]  *Id.* at 32.  He testified that "30 pills

---

[2]  As further support for inferring intent to distribute from the quantity, there is no evidence that Carter had any condition as of November 29, 2009 that required the large quantity of OxyContin purportedly prescribed to her by Dr. Bergfeld.  *See* ECF No. 85 at 67.

10

(1:13cr170)

would—should be enough to get the patient through the acute episode of pain." *Id.* Each

prescription presented at trial sought a quantity of 90 OxyContin pills of 80 mg strength. In

total, the Government presented evidence that Defendant either procured or attempted to procure

450 OxyContin pills of 80 mg strength.

     The Government also presented evidence of the unusually high strength of the

OxyContin sought by Defendant. The Government presented testimony from Christina Cannata,

a pharmacist at Walgreens, who testified that 80 mg is "a very high dose," particularly for

patients who had not previously been prescribed OxyContin. ECF No. 85 at 152. Ms. Cannata

further testified that 80 mg was the highest dosage that her pharmacy stocked. *Id.* at 157. In

order to receive an 80 mg dosage, a patient typically went through a process called titration to

prepare the person's body for the strength of the dosage. *Id.* at 157. The Government presented

evidence that Defendant had not been titrated for OxyContin usage—the only evidence of

Defendant's having received a legitimate prescription for a medicine containing oxycodone was

a 2007 prescription for 5ml liquid dosage. *Id.* at 245.

### 3. Conclusion-Count 1, Conspiracy to Possess with Intent to Distribute

     Viewing the evidence in light most favorable to the Government, there was more than

sufficient evidence from which a reasonable mind might fairly conclude guilt beyond a

reasonable doubt as to Count 1. The evidence was sufficient to establish (1) the existence of a

conspiracy to distribute OxyContin, (2) Defendant's knowledge and intent to participate in the

conspiracy, and (3) Defendant's participation in the conspiracy. Moreover, the evidence was

sufficient to allow a jury to conclude that Defendant intended to distribute the illegally obtained

(1:13cr170)

pills rather than personally use them.

**B. Counts 2-5: Aiding and Abetting Health Care Fraud**

In order to obtain a conviction for health care fraud under 18 U.S.C. § 1347, the Government must establish, beyond a reasonable doubt, that Defendant: "(1) knowingly devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items, or services; (2) executed or attempted to execute this scheme or artifice to defraud; and (3) acted with intent to defraud." *United States v. Hunt*, 521 F.3d 636, 645 (6th Cir. 2008) (quoting *United States v. Raithatha*, 385 F.3d 1013, 1021 (6th Cir. 2004), *vacated on other grounds*, 543 U.S. 1136 (2005)). One who aids and abets another in the commission of an offense against the United States is punishable as a principal. 18 U.S.C. § 2. To prove that a defendant aided and abetted a crime, the Government must prove "(1) an act by a defendant which contributes to the execution of a crime; and (2) the intent to aid in its commission." *United States v. Davis*, 306 F.3d 398, 409 (6th Cir. 2002) (quoting *United States v. Lowery*, 60 F.3d 1199, 1202 (6th Cir. 1995)).

Defendant concedes that the Government proved the existence of a health care fraud scheme. Defendant argues, however, that the Government did not present sufficient evidence that shows that Defendant participated in the commission of the health care fraud with the intent that the fraud be committed. ECF No. 90 at 19. Defendant argues that the Government did not present evidence that Defendant knew that a health care fraud had been committed. Specifically, Defendant argues that the Government's evidence about Defendant's insurance card just as likely supports the conclusion that some other person used Defendant's health insurance without

12

(1:13cr170)

her knowledge.  *Id.* at 20.  Defendant also argues that the evidence relating to whether an

Explanation of Benefits was issued after a prescription failed to adjudicate does not prove that

Defendant knew that her insurance card had been used.  *Id.* at 20.

> **1.     The Government Presented Sufficient Evidence That Defendant
> Knew of and Assisted in the Commission of Health Care Fraud**

The Government presented circumstantial evidence of Defendant's participation in the

Wray/Cook prescription conspiracy.  The four Wray/Cook prescriptions were for the same

quantity and dosage of OxyContin as the fraudulent Carter/Bergfeld prescription that Defendant

provided to Carter with instructions that Carter fill it.  *See* ECF No. 85 at 183.  Moreover, the

four Wray/Cook prescriptions were incorrectly written in the same way as the Carter/Bergfeld

prescription: all prescriptions contained superfluous and contradictory shorthand about how

frequently per day, and the manner in which, the patient should take the medicine.  *Id.* at 33, 183.

The Government also presented evidence about the timing in which someone had

attempted to fill each fraudulent prescription.  Jeffrey Schmitt testified that there were four Dr.

Cook prescriptions for OxyContin which Defendant's insurance paid for: October 9, November

8, December 2, and January 19.  *Id.* at 247–52.  Schmitt also testified that someone had

attempted to fill a Wray/Cook prescription on November 29th, but the claim was rejected

because 30 days had not yet passed since the November 8th prescription had been filled.  *Id.* at

250.  Carter attempted to pass the **Carter/Bergfeld** fraudulent prescription on November 29th—

the same day that a Wray/Cook prescription had been rejected.  *Id.* at 145.

The Government also presented evidence about the location at which the Wray/Cook

prescriptions were filled.  Bradley Janko, a pharmacist at CVS, testified about the procedure by

13

(1:13cr170)

which a pharmacy verifies a first-time customer's insurance coverage.  Janko testified that the

customer would either need to provide her insurance card or the name of her insurance provider

and date of birth to allow a pharmacy to bill the insurance company for the prescription.  ECF

No. 85 at 208–09.  The Government also presented evidence that proved that Defendant had not

had prescriptions filled at CVS prior to the filling of the Wray/Cook prescriptions.  *Id.* at

246–47.  Therefore, whoever filled the four Wray/Cook prescriptions needed sufficient

information to convince CVS to fill the narcotic drug prescription.  This, the Government argues,

supports the conclusion that Defendant either provided her old insurance card or, minimally,

enough personal information to authorize her insurance to cover the fraudulent prescriptions.

Finally, the Government presented evidence that disproved Defendant's argument that

her insurance had been used without her knowledge.  Schmitt, who managed the prescription

drug benefits for Cleveland Clinic employees, testified that Defendant would have received an

Explanation of Benefits form following the failed attempt to fill the Wray/Cook prescription on

November 29.  *Id.* at 250–51.  The Government argues that the Explanation of Benefits would

have put Defendant on notice that someone had attempted to fraudulently used her insurance.

The Government also argues that Defendant's receipt of a new insurance card in October 2009

corroborates Schmitt's testimony.  ECF No. 78.  The Government argues that, had Defendant not

been involved in the health care fraud, the issuance of a new insurance card and the Explanation

of Benefits would have been sufficient to put her on notice that her insurance had been used

without her authorization.  Had Defendant not been involved in aiding and abetting health care

fraud, the argument goes, Defendant would have taken some corrective action.  The lack of any

14

(1:13cr170)

such action supports a reasonable inference that her insurance card had been deliberately

supplied to the person or persons whom filled the four Wray/Cook prescriptions.

### 2. Conclusion-Counts 2-5, Aiding and Abetting Health Care Fraud

The Court concludes that, when viewing the evidence in light most favorable to the

Government, there was more than sufficient evidence from which a reasonable mind might fairly

conclude beyond a reasonable doubt that Defendant was guilty of aiding and abetting healthcare

fraud as charged in Counts 2–5. The evidence was sufficient to establish that Defendant knew of

the scheme to commit health care fraud, and that Defendant acted to encourage the health care

fraud's success.

### C. Counts 6-9: Aiding and Abetting Aggravated Identity Theft

For a conviction of committing aggravated identity theft in violation of 18 U.S.C. §

1028A(a)(1), the Government must prove, beyond a reasonable doubt, that the defendant,

"during and in relation to a felony violation enumerated in subsection (c), knowingly transfers,

possesses, or uses, without lawful authority, a means of identification of another person." 18

U.S.C. § 1028A(a)(1). The statute defines "means of identification" as "any name or number

that may be used, alone or in conjunction with any other information, to identify a specific

individual." 18 U.S.C. § 1028A(d)(7). "'[A]nother's name in the form of a signature is

[included in] the definition of means of identification.'" *United States v. Williams*, 553 F. App'x

516, 518 (6th Cir. 2014) (quoting *United States v. Blixt*, 548 F.3d 882, 887 (9th Cir.2008))

(internal quotation marks omitted), *cert. denied*, 134 S. Ct. 2713 (2014). The Sixth Circuit has

held that "without lawful authority" refers to the use of the means of identification, not how the

15

(1:13cr170)

defendant obtained the means of identification. *United States v. Lumbard*, 706 F.3d 716, 723–24 (6th Cir. 2013) ("[O]ne could have permission to use an individual's identifying information, but that permission itself does not confer lawful authority to misuse the information. . . . Because § 1028A only applies when the information is used in connection with one or more of the enumerated felonies, permission will never be sufficient to avoid its application.").

Defendant advances two arguments as to why the evidence was insufficient to convict her for Aggravated Identity Theft. Relative to Count 6, Defendant argues that the Government did not present sufficient evidence because the prescription supporting the conviction did not include Dr. Cook's DEA number. ECF No. 90 at 23. As to all four counts of Aggravated Identity Theft, Defendant argues that the Government did not present any evidence that proved Defendant knew that Aggravated Identity Theft had been committed and that she had acted to promote its commission.

### 1. The Government Presented Sufficient Evidence That a Means of Identification for Dr. Cook Had Been Used Without Lawful Authority

The Government presented testimony of Dr. Cook about the four fraudulent prescriptions. Dr. Cook testified that she writes prescriptions for pain medication but has never written a prescription for OxyContin. ECF No. 85 at 179–80. Dr. Cook testified that she has not treated a patient named Charmin Wray nor Charmin Reeves. *Id.* at 182. Finally, Dr. Cook testified that she did not write any of the four fraudulent prescriptions. *Id.* at 187. The evidence showed that all four Wray/Cook prescriptions for OxyContin had the same dosage, quantity, and incorrect medical terminology, were filled at a CVS pharmacy, and had fraudulently included Dr. Cook's name as the prescribing doctor. Dr. Cook's name, a "means of identification" under

16

(1:13cr170)

18 U.S.C. § 1028A(d)(7), had been used without lawful authority for each Wray/Cook

prescription.

### 2.  The Government Presented Sufficient Evidence That Defendant Knew That Aggravated Identity Theft Had Been Committed and That Defendant Promoted its Commission

The Government argues that the evidence supporting Defendant's health care fraud

convictions also supports Defendant's aggravated identity theft convictions.  The evidence

reflects that Defendant has not received treatment from Dr. Cook.  When Defendant supplied her

insurance information for the purpose of aiding and abetting health care fraud, she knew that the

doctor's signature on the prescription would be used unlawfully because she had not been treated

by the doctor whose name appeared on the prescription.  Evidence proving that Defendant knew

the prescriptions were fraudulent also proves that Defendant knew the identity of a doctor had

been used without lawful authority.

Similarly, the act of supplying her insurance card promoted the commission of

Aggravated Identity Theft.  Obtaining OxyContin through fraudulent means was the purpose for

using Dr. Cook's name without lawful authority.  Dr. Cook's name was necessary, but not alone

sufficient, to fill fraudulent prescriptions.  Defendant's insurance card permitted the prescriptions

to be filled.  Therefore, in acting to assist in filling the prescriptions, Defendant also acted to

promote Aggravated Identity Theft.

### 3.  Conclusion-Counts 6-9, Aiding and Abetting Aggravated Identity Theft

When viewing the evidence in light most favorable to the Government, there was more

than sufficient evidence from which a reasonable mind might fairly conclude beyond a

17

(1:13cr170)

reasonable doubt that Defendant was guilty as to Counts 6–9. The evidence was sufficient to establish that Defendant knew about the scheme to commit health care fraud, and that Defendant acted to encourage the health care fraud's success.

**D. Manifest Weight**

For the same reasons provided in her argument supporting her Motion for Judgment of Acquittal, Defendant argues that a new trial is warranted. Defendant argues that a new trial is warranted because of "a lack of credible evidence of guilt for any of the offenses charged." ECF No. 90 at 25. According to Defendant, the Government "provided no proof for a number of the elements of each offense charged." *Id.* at 25.

The Court has reviewed the evidence and, for the reasons described above, concludes that the interest of justice does not require a new trial. Rule 33 permits a court to substitute its judgment where it is clear that the evidence was lacking. Fed. R. Crim. P. 33. Sitting as a "thirteenth juror," the Court concludes that the evidence overwhelmingly demonstrated that Defendant committed the offenses for which she was charged in the superseding indictment. *See United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988). In reviewing the evidence and the testimony of the witnesses, the Court finds no "extraordinary circumstance where the evidence preponderates heavily against the verdict." *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007). Because there is no extraordinary circumstance, the jury's verdict rests and there is no need for a new trial.

**E. Legal Error**

Defendant asserts that the Court's instructions to the jury with respect to deliberate

18

(1:13cr170)

indifference were erroneous.  The Court provided the jury with the following instruction on

deliberate indifference relative to Counts 2–5 (the four counts of health care fraud):

> No one can avoid responsibility for a crime by deliberately ignoring the obvious.
>
> If you are convinced that the defendant deliberately ignored a high probability that health care fraud was being committed, then you may find that she knew that health care fraud was being committed.
>
> But to find this, you must be convinced beyond a reasonable doubt that the defendant was aware of a high probability that health care fraud was being committed and that the defendant deliberately closed her eyes to what was obvious.
>
> Carelessness or negligence or foolishness on her part is not the same as knowledge and is not enough to convict.

ECF No. 86 at 53–54.  Defendant argues that the Government failed to present evidence that

Defendant consciously avoided learning the truth about whether health care fraud was being

committed.  It was legal error to include the deliberate instruction without the supporting factual

predicate, Defendant argues, and therefore the Defendant should receive a new trial.

The Sixth Circuit has adopted the following test for determining whether a deliberate

indifference instruction is warranted: (1) the defendant claims a lack of guilty knowledge; and

(2) the facts and evidence support an inference of deliberate ignorance.  *United States v.

Mitchell*, 681 F.3d 867, 876 (6th Cir. 2012).  "Before giving the instruction, the district court

therefore must determine that there is evidence to support an inference 'that the defendant acted

with reckless disregard of [the high probability of illegality] or with a conscious purpose to avoid

learning the truth.'"  *Id.* (quoting *United States v. Seelig*, 622 F.2d 207, 213 (6th Cir.1980)).  In

determining whether the jury instructions fail to accurately reflect the law, "no single provision

19

(1:13cr170)

of the jury charge may be viewed in isolation; rather, the charge must be considered as a whole."

*United States v. Ross*, 502 F.3d 521, 527 (6th Cir. 2007). "A judgment may be reversed based upon an improper jury instruction only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Id.* (internal quotations omitted).

The jury instructions do not warrant a new trial. The record contains sufficient evidence to warrant the deliberate indifference instruction. The parties stipulated that Defendant was issued a pharmacy benefits card in October 2009. ECF No. 73. Schmitt testified that he believed Defendant would have received an Explanation of Benefits when the November 29 Wray/Cook prescription failed to adjudicate and a new insurance card. The Government argues that these facts support the inference that Defendant was aware that her insurance information had been used in a fraudulent manner. The Court agrees. These facts coupled with Defendant's denial of knowledge, made the deliberate indifference instruction appropriate.

Moreover, any purported legal error contained in the deliberate indifference instruction is irrelevant as to whether Defendant should receive a new trial on the heath care fraud charges. The deliberate indifference instruction applied solely to Defendant's guilt as a principal to the health care fraud scheme. ECF No. 86 at 53–54. The jury also returned verdicts finding Defendant guilty as an aider and abettor to health care fraud. ECF No. 80 at 2–5. The portion of the jury instructions relating to Defendant's culpability as an aider and abettor does not reference the deliberate indifference instruction. ECF No. 86 at 55–56. It was not necessary, therefore, for the jury to rely on the deliberate indifference instruction to reach its verdicts as to Counts 2–5. Consequently, the deliberate indifference instruction does not warrant a new trial.

20

(1:13cr170)

## IV.  Conclusion

For the reasons above, the Court denies, in its entirety, Defendant's Motion for a Judgment of Acquittal and for New Trial.


IT IS SO ORDERED.


  December 30, 2014                              /s/ Benita Y. Pearson
Date                                        Benita Y. Pearson
                                            United States District Judge

21